UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DICK CORPORATION, a Pennsylvania corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 04 C 1043 |
| SNC-LAVALIN CONSTRUCTORS, INC., a Delaware corporation and PCL INDUSTRIAL CONSTRUCTION, INC., a Colorado Corporation, JOHN GILLIS and MICHAEL RANZ, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER AND OPINION**

MARVIN E. ASPEN, District Judge:

Plaintiff Dick Corporation's Fourth Amended Complaint against Defendants SNC-Lavalin Constructors, Inc., PCL Industrial Construction, Inc., John Gillis, and Michael Ranz, alleges copyright infringement, tortious interference with prospective business relations, tortious interference with contractual relations, conversion, and misappropriation of trade secrets. Presently before us is defendants Gillis' and Ranz's ("Defendants") motion to dismiss for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted. As set forth below, we find that the fiduciary shield doctrine prevents us from exercising personal jurisdiction over Defendants.

**BACKGROUND**

Plaintiff Dick Corporation ("Dick") is a company registered and organized under the laws of Pennsylvania with its principal place of business in Large, Pennsylvania. (Fourth Am. Compl. ¶ 1.) Around May 12, 1999, Dick entered into a joint venture with the National Energy

1

Production Corporation ("NEPCO"), a Delaware corporation, to serve as the general engineering, procurement and construction contractor for the Kendall County Generation Facility ("Kendall"), a power plant located in Minooka, Illinois. (*Id.* ¶¶ 2, 12-13.) "As part of the [j]oint [v]enture, Dick and NEPCO created certain engineering designs, drawings, design data, calculations, specifications, intellectual property and other related documents [("Drawings")] ... [and] certain scheduling information, cost projections, cost information, bidding information and other financial reports ... [("Data")] for the purpose of constructing the Kendall facility." (*Id.* ¶¶ 18-19.) The Dick/NEPCO joint venture agreement included exclusivity provisions, such as "all documents produced for or by the [j]oint [v]enture shall be owned by the [j]oint [v]enture ... [N]either party shall use the documents for other projects without the prior written consent of the others." (*Id.* ¶ 17.) The agreement also prohibited either party from transferring or assigning any joint venture work product without prior written consent. (*Id.* ¶ 16.)

On December 21, 2000, NEPCO executed a contract with LSP-Nelson to perform engineering, procurement, and construction services for the Nelson facility ("Nelson"), a power plant located in Dixon, Illinois. (*Id.* ¶¶ 12, 21.) NEPCO created a joint venture with PCL Industrial Construction, Incorporated ("PCL"), a Colorado corporation, regarding performance of the Nelson contract on February 28, 2002, at which time LSP-Nelson and PCL entered into an "Amended and Restated Turnkey Engineering, Procurement and Construction Agreement dated as of December 21, 2000 ("Restated Nelson Contract")." (*Id.* ¶ 22.) The Restated Nelson Contract provides that "major power block design, equipment layout, building general arrangement, condensate/feedwater/steam piping design, and electrical design for the [Nelson]

2

[f]acility are substantially similar to that for the Kendall Project." (*Id.* ¶ 24.) In the spring of 2002, SNC Lavalin Constructors, Inc. ("SNC"), SNC Lavalin's subsidiary, "entered into an arrangement to perform construction-related services at the Nelson [f]acility." (*Id.* ¶ 23.)

Dick filed a five count complaint in the Northern District of Illinois alleging that SNC, PCL, John Gillis, and Michael Ranz improperly and without consent copied, distributed, misappropriated, used, and created derivative works from the joint venture Drawings and Data to construct Nelson. (*Id.* ¶ 29.) Gillis, former President of NEPCO and current Chief Operating Officer at SNC, and Ranz, former Vice President of NEPCO and current Senior Vice President of SNC - both residents of Redmond, Washington - moved to dismiss the charges against them claiming a lack of personal jurisdiction. (Mot. to Dismiss at 5,6.) Dick counters that both individual defendants established minimum contacts with Illinois since they each **knew about the restrictive covenants in the Dick/NEPCO joint venture agreement, executed and/or participated in the negotiation and performance of the Kendall and Nelson contracts, and managed and supervised both Illinois projects. (Fourth Am. Compl. ¶¶** 20-31, 34-41; Pl. Resp. to Mot. to Dismiss at 9-19.)

**STANDARD OF REVIEW**

In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of showing a *prima facie* case of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003); *see RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir.1997); *Wasendorf v. DBH Brokerhaus AG*, No. 04 C 1904, 2004 WL 2872763, at *2 (N.D. Ill. Dec. 13, 2004). In determining whether we have personal jurisdiction, we may receive and consider affidavits and other materials submitted by the parties.

3

*See Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir. 1987), *superceded by statute on other grounds as stated in FMC Corp. v. Varonos*, 892 F.2d 1308, 1310 (7th Cir. 1990). For purposes of a motion to dismiss based on personal jurisdiction, we "accept all allegations of the complaint as true except those controverted by defendants' affidavits." *Northwestern Corp. v. Gabriel Mfg. Co.,* No. 96 C 2004, 1996 WL 73622, at *2 (N.D. Ill. Feb. 6, 1996). Where the defendant submits an affidavit contesting personal jurisdiction, "the plaintiff *must go beyond the pleadings and submit affirmative evidence* supporting the existence of jurisdiction." *Purdue,* 338 F.3d at 783 (emphasis added). We resolve all factual disputes in the record in plaintiff's favor, but we may accept as true those facts presented by defendant that remain uncontested. *Id.; RAR*, 107 F.3d at 1275.

## ANALYSIS

### I. Personal Jurisdiction

In a case based on diversity of citizenship, a federal court sitting in Illinois may exercise personal jurisdiction over a nonresident defendant only to the extent that an Illinois court could do so. *Klump v. Duffus,* 71 F.3d 1368, 1371 (7th Cir.1995); s*ee Michael J. Neuman & Assoc., Ltd. v. Florabelle Flowers, Inc.,* 15 F.3d 721, 724 (7th Cir.1994). Therefore, to survive a motion to dismiss the plaintiff must make a *prima facie* showing that exercising jurisdiction over a nonresident party complies with the Illinois long-arm statute, the Illinois Constitution, and federal constitutional due process requirements. *See Cent. States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 939 (7th Cir. 2000); *see also RAR,* 107 F.3d at 1276.

The Illinois long-arm statute permits Illinois courts to exercise jurisdiction over a

defendant where the cause of action arises from the transaction of business, commission of a tort, "making or performance of any contract or promise substantially connected with this State[,]" or any basis permitted by the state and federal Constitutions. 735 Ill. Comp. Stat. 5/2-209 (a) (1, 2, 7), (c); *Cent. States,* 230 F.3d at 940; *RAR,* 107 F.3d at 1276. The record demonstrates that Gillis and Ranz each established minimum contacts with Illinois subjecting themselves to this court's jurisdiction. For example, Gillis executed and Ranz was involved with negotiating and overseeing the two contracts at issue, which were to be performed in Illinois.[1]

Gillis' and Ranz's lack of material presence in Illinois does not preclude finding that they established the requisite minimum contacts because the Supreme Court has held that an individual who never physically enters the forum state could nonetheless be subject to its jurisdiction if he purposefully directs conduct towards residents of the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, 105 S. Ct. 2174 (1985) (finding personal jurisdiction in Florida where the defendant knowingly engaged in a business relationship with the plaintiff, a Florida company, even though he never entered Florida to conduct business); *see also Calder v.*

---

[1] More specifically, Gillis executed the Dick/NEPCO joint venture agreement, the NEPCO/LSP-Kendall contract, and the Nelson contract. (Resp. to Mot. to Dismiss at 3-4, 6-7.) Ranz executed a services agreement for engineering work on Kendall, the joint venture with PCL, and the subcontract for construction on Nelson. (*Id.* at 5.) Also, Gillis was a member and Ranz was an alternate member of the "Executive Committee" for the Dick/NEPCO joint venture and the PCL agreement. (*Id.* at 3, 6.) Additionally, Ranz "led the discussions" while negotiating with PCL and used Kendall Drawings and Data in developing an estimate for Nelson. (*Id.* at 4,5; Ranz Dep. at 91.) While Ranz did not directly supervise or participate in the construction of either project, he was responsible for general oversight of the project managers and project directors. (Resp. to Mot. to Dismiss at 5-6.) For example, he visited Illinois three times to participate in Kendall and/or Nelson meetings about schedule status, staffing, safety, quality, financial status, and client relations. (*Id.* at 6; Ranz Dep. at 40.) Finally, Gillis and Ranz received periodic status reports on Kendall and Nelson, both defendants attended monthly meetings where all pending projects were discussed, and both individuals were aware at all times that Kendall and Nelson were in Illinois. (Resp. to Mot. to Dismiss at 4, 6-7.)

*Jones*, 465 U.S. 783, 788, 104 S. Ct. 1482 (1984) (finding that despite the lack of physical contacts with the forum state, an editor and journalist of a Florida-based tabloid periodical were subject to personal jurisdiction in California in an action arising out of an allegedly defamatory article regarding a California resident). Gillis and Ranz purposefully directed their actions toward Illinois by entering into contracts that called for performance in the state and by participating in and overseeing performance in Illinois.[2]

Defendants argue that the above described principle, coined "the effects doctrine," does not apply because plaintiff is not an Illinois resident. We disagree. In applying the effects doctrine, the Seventh Circuit focuses on the location of the alleged injury rather than the plaintiff's residency. *See Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997) ("[T]he state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deeds even if events were put in train outside its borders."); *see also Interlease Aviation Investors II (ALOHA) L.L.C. v. Vanguard Airlines, Inc.,* 262 F. Supp. 2d 898, 910 (N.D. Ill. 2003) (quoting and applying *Janmark); see also Spank! Music & Sound Design, Inc. v. Hanke,* No. 04 C 6760, 2005 WL 300390, at *3 (N.D. Ill. Feb. 7, 2005) ("The Seventh Circuit has interpreted the effects doctrine broadly to permit the state in which the victim of a tort suffers injury to entertain the suit, even if all other relevant conduct occurred outside the state."). Discussing its reasoning in *Janmark*, the Seventh Circuit noted that if a California corporation

---

[2] *See* n. 3, *supra*. In addition, based on the uncontroverted allegations in the complaint, Gillis and Ranz knew "the restrictions on the use, assignment and transfer of [the] Drawings and Data[, they] ... were in a position to control the use, copying, modification, assignment and transfer of the [information, and they] authorized, induced, contributed and/or approved or were otherwise a moving force behind the copying modification and use of the [information] to construct the Nelson Facility." (Resp. to Mot. to Dismiss. at 12.)

6

injured an Illinois corporation in New Jersey, New Jersey would retain jurisdiction despite the fact that the victim would suffer financial consequences in Illinois. *Id*. at 1202. Similarly, a Pennsylvania corporation doing business in Illinois can be injured in Illinois, thus allowing Illinois to exercise jurisdiction upon the wrongdoers. Plaintiff allegedly suffered harm in Illinois, *inter alia,* because the Nelson power plant - located in Illinois - was built using Kendall's Drawings and Data in violation of the agreement with NEPCO, which prohibited transfer, distribution, or use of intellectual property created by the Dick/NEPCO joint venture for Kendall.[3]

Gillis and Ranz "purposefully availed [themselves] of the privilege of conducting activities within [Illinois], thus invoking the protections and benefits of its laws." *See Hanson v. Denckla,* 357 U.S. 235, 253, 78 S. Ct. 1228 (1958). Dick's claims arose from and relate to Gillis' and Ranz's contacts with Illinois, justifying the exercise of specific jurisdiction.[4] *Helicopteros,* 466 U.S. at 414 n.8; *RAR,* 107 F.3d at 1278. The deposition testimony and unrefuted allegations in the complaint show that Gillis and Ranz were substantially involved (in

---

[3] The cases cited by defendant are inapposite. Gillis and Ranz knew the Kendall and Nelson contracts called for performance in Illinois, the alleged wrongful use of the Drawings and Data occurred in Illinois (evidenced by the existence of the Nelson power plant), and plaintiff allegedly lost its competitive advantage in Illinois. *Cf. Continental Cas. Co. v. Marsh,* No. 01 C 0160, 2002 WL 31870531, at *6 (N.D. Ill. Dec. 23, 2002) (finding that defendant would not reasonably anticipate being haled to court in Illinois where no evidence supported the argument that defendant's allegedly wrongful activities regarding a financing agreement with a Maryland corporation were directed to that company's Illinois, as opposed to Maryland, office.)

[4] Plaintiff does not contend that Gillis' and Ranz's contacts with Illinois are sufficiently pervasive to subject them to general jurisdiction, which requires "continuous and systematic general business contacts" with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S. Ct. 1868 (1984); (Resp. to Mot. to Dismiss at 9, n.5.). Rather, plaintiff submits that we have specific jurisdiction because its claims arose from and relate to Gillis' and Ranz's contacts with Illinois. *Id.* at 414 n.8; *RAR,* 107 F.3d at 1278.

7

their official capacity) with the execution and performance of the two contracts to build power plants in Illinois. Consequently, the defendants "should [have] reasonably anticipate[d] being haled into court" in Illinois. *See Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 716 (7th Cir. 2002) (quoting *Burger King Corp.,* 471 U.S. at 474 (internal citations omitted)).

Nonetheless, exercising jurisdiction over Gillis and Ranz would offend traditional notions of fair play and substantial justice under Illinois law. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945); *see also Rollins v. Ellwood*, 141 Ill.2d 244, 275, 565 N.E.2d 1302, 1316 (Ill. 1990) ("[J]urisdiction is to be asserted only when it is fair, just, and reasonable to require a non-resident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois."). Generally, "[t]he most important factors relevant to this inquiry are the interests of the states involved and the relative convenience of litigating in each state."[5] *Spank!,* 2005 WL 300390, at *3. However, if an individual has contact with a state only by virtue of his acts as a fiduciary of a corporation, such acts may not form the basis for the exercise of personal jurisdiction in Illinois. *Brujis v. Shaw*, 876 F. Supp. 975, 978 (N.D. Ill. 1995) (citation omitted). This "fiduciary shield" gives effect to the concept of limited liability in corporations.

When assessing applicability of the equitable doctrine, courts consider the fiduciary's discretionary actions, personal interest, and whether the fiduciary is merely the corporation's

---

[5] If our inquiry were limited to the interests/burden analysis, exercising jurisdiction over defendants would be proper. Dick correctly points out that Illinois has an interest in this action because it involves the development of properties and services within its boundaries and protecting foreign companies conducting business with an Illinois license (which in turn helps encourage foreign investment). In addition, the majority of alleged wrongdoing and resulting injury occurred in Illinois. While defendants would likely prefer to adjudicate the claims in their home state, it is not unduly burdensome to travel and litigate in Illinois, especially since they would most likely be called as witnesses in the pending action in Illinois against their employer.

alter-ego. *See Interlease Aviation,* 262 F. Supp. 2d at 912; *TruServe Corp. v. St. Yards, Inc.*, No. 99 C 6806, 2001 WL 743642, at *6 (N.D. Ill. June 29, 2001). There is no clear consensus in Illinois over the significance of each factor when applying the doctrine to high ranking corporate officials.[6] Although, the most recent string of cases have allowed high ranking officers with discretionary authority to benefit from the fiduciary shield doctrine so long as they did not have an appreciable ownership interest in the company.[7]

Gillis and Ranz were (and still are) high ranking officials of NEPCO/SNC who established contacts with Illinois in their roles as corporate fiduciaries. In their official capacities, defendants were endowed with discretionary authority, and in fact used their discretion to enter into, execute, and monitor contracts[8] calling for performance in Illinois. *See*

---

[6] *See, e.g., Cons. Benefit Svcs., Inc. v. Encore Marketing Int'l*, No. 01 C 6985, 2002 WL 31427021, *3 (N.D. Ill. Oct. 30, 2002) (quoting *Plastic Film Corp. of Am., Inc. v. Univac, Inc.,* 128 F. Supp. 2d 1143, 1147 (N.D. Ill. 2001) ("The determinative factor is the individual's status as a shareholder, not merely as an officer or director.")); *Shapo v. Engle,* No. 98 C 7909, 1999 WL 1045086, at *22 (N.D. Ill. Nov. 12, 1999) (ruling that the fiduciary shield doctrine does not apply to high ranking corporate officers); *Brujis*, 876 F. Supp at 979 (declaring no one factor determinative).

[7] *Benda v. Per-Se Technologies, Inc.,* No. 04 C 952, 2004 WL 1375361, at *2 (N.D. Ill. June 17, 2004) (reiterating that the "determinative factor is the individual's status as a shareholder, not merely as an officer or director") (quotation omitted); *Interlease Aviation*, 262 F. Supp. 2d at 912 (holding that being a high ranking officer of a company was insufficient to bar application of the fiduciary shield doctrine absent evidence of a personal stake in the company); *Continental Cas. Co.,* 2002 WL 31870531, at *6-7 (determining that a vice president of a corporation was covered by the fiduciary shield doctrine despite being a high ranking official with discretion because he had no financial stake in the company); *Plastics Film Corp.*, 128 F. Supp. 2d at 1147 (holding that a CEO was protected by the fiduciary shield doctrine because he was not a shareholder of the corporation); *but see Margulis v. Med. Parts Int'l, Inc.*, No. 98 C 0714, 1999 WL 183648, at *5 (N.D. Ill. Mar. 25, 1999) (barring use of fiduciary shield doctrine for high-ranking officers because they had a stake in the company merely as a result of their position).

[8] Both defendants participated in monthly meetings to review schedule status, staffing, safety quality, finances, and client relations for all projects, including Kendall and Nelson, but

n.1, *supra*. However, the evidence shows that Gillis' involvement with the contracts at issue was perfunctory: he executed the contracts without close inspection, he could not recall any involvement in soliciting, negotiating, or performing the contracts, and he never copied or distributed (or directed anyone else to do so) the Drawings and Data. (Gillis Aff. ¶¶ 11-12; Gillis Dep. at 15-21, 23-24, 30.) Ranz took a more active role in the Illinois ventures: he engaged in the negotiating process for Nelson and visited Illinois on three occasions related to the Kendall project. (Ranz Dep. at 40.) The disparity between the defendants' involvement with Kendall and Nelson is inconsequential since "[t]he determinative factor is the individual's status as a shareholder[.]" *Plastic Film Corp.*, 128 F. Supp. 2d at 1147.

Gillis and Ranz received stock options in Enron, NEPCO's parent company, and owned Enron stock through their respective 401-K programs. (Gillis Dep. at 34-35; Ranz Dep. at 107-08.) After 2002, Gillis also held stock options for shares in SNC-Lavalin, Inc., SNC's parent company. (Gillis Dep. 36-37.) The evidence, however, does not suggest that the issuance of stock options was related to the corporate officials' performance or company profitability. (Ranz Dep. at 107-08.) Moreover, most courts infer personal interest only where corporate officers have a direct, meaningful financial stake in the company.[9] Dick does not allege that Gillis or Ranz owned a direct interest in NEPCO and/or SNC, nor does it allege that either defendant held an appreciable interest in their employers' parent companies. Defendants' stock options and

---

neither Gillis nor Ranz directly supervised construction of the Illinois power plants. (Gillis Dep. at 13-15; Ranz Dep. at 48.)

[9] *See, e.g., Cons. Benefit Servs.*, 2002 WL 31427021, at *4 (refusing to apply the fiduciary shield doctrine to the CEO and President where both officers exercised discretion and respectively owned 32.49% and 20.35% of the company); *see also Brujis*, 876 F. Supp. at 979 (finding personal interest where the president owned the vast majority of the company's stock).

401-K shares do not evince the kind of meaningful, direct financial stake and/or personal interest contemplated by *Benda*, *Plastic Film Corp,* and *Continental Casualty Company*.[10]

Additionally, the Fourth Amended Complaint contains no allegations that Gillis and/or Ranz acted "to advance personal rather than employer interests[,]" nor do the pleadings or the evidence support such an inference. *See Benda,* 2004 WL 1375361, at *2 (quotation omitted). The allegations in the pleadings, the affidavits, and the deposition testimony all indicate that Gillis's and Ranz's actions were "a product of, and [were] motivated by, [their] employment situation and not [their] personal interest, ...[Thus] it would be unfair to use [such] conduct to assert personal jurisdiction over [them] as [] individual[s]." *Cons. Benefit Svcs., Inc.,* 2002 WL 31427021, at *2 (quoting *Rollins,*141 Ill.2d at 280, 565 N.E.2d at 1318). Absent a showing of meaningful, direct personal interest in NEPCO or SNC, barring application of the fiduciary shield would not comport with fair play and substantial justice.[11]

---

[10] Recognizing the limited nature of defendants' ownership interest, Dick points to Gillis and Ranz's compensation to support a finding of personal interest. Ranz and Gillis speculated that bonuses were based on the company's profitability; if awarded, bonuses could comprise 10% to 25% of defendants' total compensation. (Gillis Dep. at 33; Ranz Dep. at 102-03.) However, defendants' interest in remuneration and job security is not the type of personal stake that warrants denial of the fiduciary shield. *See Glass v. Kemper Corp.*, 930 F. Supp. 332, 342 (N.D. Ill. 1996) ("[T]he Illinois Supreme Court has expressly foreclosed [plaintiff's] argument that [defendant] benefitted financially from his Illinois contacts in that he was attempting to curry favor with his employer, presumably to remain employed and earn a salary or salary increase.") Defendants did not benefit from a profit-sharing arrangement with the company, nor could they even specify how Kendall and Nelson (a small fraction of the company's projects) would factor into their overall compensation.

[11] Dick does not allege that NEPCO and/or SNC were sham corporations or that Gillis and/or Ranz acted as the companies' alter egos.

**CONCLUSION**

For the reasons discussed above, defendants' motion to dismiss for lack of personal jurisdiction is granted.[12]  It is so ordered.

/s/ Marvin E. Aspen
MARVIN E. ASPEN
United States District Judge

Dated: 4/20/06

---

[12] As a result of our ruling, we need not consider defendants' motions to dismiss for failure to state a claim.